IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

PATRICK HOLLOWAY                                                    PLAINTIFF


        v.                              CIVIL NO. 20-5113


ANDREW M. SAUL, Commissioner
Social Security Administration                                      DEFENDANT


### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

        Plaintiff, Patrick Holloway, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claims for a period of disability and disability insurance benefits (DIB) and supplemental security income (SSI) benefits under the provisions of Titles II and XVI of the Social Security Act (Act).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  See 42 U.S.C. § 405(g).

### I.      Procedural Background:

        Plaintiff protectively filed his current applications for DIB and SSI on October 2, 2017, alleging an inability to work since September 22, 2016, due to a herniated disc in the lower back, neck and shoulder pain, and bipolar disorder.  (Tr. 55, 239).  An administrative hearing was held on April 11, 2019, at which Plaintiff appeared with counsel and testified. (Tr. 35-52).

        By written decision dated August 8, 2019, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe. (Tr. 22).

Specifically, the ALJ found Plaintiff had the following severe impairments: degenerative disc disease, hypertension, morbid obesity, and bipolar disorder. However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 22). The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). The claimant can occasionally climb ramps and stairs but should avoid climbing ladders, ropes, and scaffolds. The claimant can occasionally balance, stoop, kneel, crouch, and crawl. The claimant can occasionally reach overhead bilaterally. The claimant's work should involve interpersonal contact that is only routine but superficial in nature, e.g., a grocery checker. The complexity of the tasks shall be learned by experience with several variables and the use of judgment within limits. Required supervision is little for routine tasks but detailed for non-routine tasks.

(Tr. 23). With the help of a vocational expert, the ALJ determined Plaintiff could perform work as a telephone information clerk, an addressing clerk, and a ticket counter. (Tr. 28).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which after reviewing additional evidence submitted by Plaintiff denied that request on May 4, 2020. (Tr. 1-5). Subsequently, Plaintiff filed this action. (Doc. 2). Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation. (Docs. 18, 19).

The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs, and are repeated here only to the extent necessary.

## II.    Evidence Presented:

At the time of administrative hearing on April 11, 2019, Plaintiff was forty-two years of age. A review of the record revealed Plaintiff obtained a high school education and completed three years of college. (Tr. 261). Plaintiff's past relevant work consists of work as a forklift driver, and a material handler. (Tr. 38, 270-277).

The medical evidence for the time period in question reflects the following. On September 30, 2016, Plaintiff underwent MRIs of the left and the right ankles. (Tr. 378). The left ankle MRI revealed the following:

> Posterior superior calcaneal enlargement with fluid insinuated between this calcaneal enlargement and the Achilles tendon. This most likely represents a Haglund's deformity/syndrome. Achilles tendon is intact.

(Tr. 379). The MRI of the right ankle revealed:

> Mild fluid along the posterior and anterior talofibular ligaments which was intact. This fluid is nonspecific. Otherwise unremarkable MRI of the right ankle.

(Tr. 381).

On October 4, 2016, Plaintiff underwent a physical therapy evaluation performed by Sean M. Pelzer. (Tr. 604-609). Plaintiff reported he was able to be active for short periods of time. Plaintiff indicated he would be "hurting fairly bad" after being at work for only two to three hours. After evaluating Plaintiff, Mr. Pelzer recommended one to two therapy sessions a week through the end of the year.

On October 6, 2016, Plaintiff was seen by Carrie A. Finley, a physical therapist, for his low back and ankle. (Tr. 603-604). Plaintiff reported that his low back was sore after doing his home exercise program. Plaintiff reported intermittent pain in his left lower extremity and that standing heel/toe raises caused some pain. Plaintiff tolerated treatment well. Plaintiff was to continue to work on lumbar and ankle strengthening.

On October 17, 2016, Plaintiff was seen by Ms. Finley for physical therapy for his low back pain and his ankles. (Tr. 600-601). Plaintiff reported his pain was a two out of ten. Plaintiff reported increased pain in his lower back with some stretches. Plaintiff tolerated treatment well. Plaintiff was to continue to work on lumbar and ankle strengthening.

On October 20, 2016, Plaintiff was seen by Mr. Pelzer for physical therapy for his low back pain and his ankles. (Tr. 598-599). Plaintiff reported no significant change with the home exercise program or the exercises performed during treatment. Mr. Pelzer noted Plaintiff voiced concerns with financial issues for his case getting tossed between short term disability and workman's compensation. Plaintiff reported his pain was a two out of ten in his lower back. Mr. Pelzer noted Plaintiff reported a slight increase in pain with repeated movements performed during treatment. Plaintiff tolerated treatment well. Plaintiff was encouraged to continue repeated movements for lumbar mobility.

On October 27, 2016, Plaintiff was seen by Derrick C. Lee, a physical therapist, for his low back pain and his ankles. (Tr. 597-598). Plaintiff reported his pain level prior to treatment was a two out of ten. Plaintiff reported his pain level was a three out of ten with walking and going to the grocery store. Mr. Lee recommended Plaintiff purchase new shoes with pronation control and noted the possibility of adding orthotics. Plaintiff tolerated treatment well. Plaintiff was to continue to work on strengthening.

On October 31, 2016, Plaintiff was seen by Mr. Pelzer for physical therapy for his low back pain and his ankles. (Tr. 596). Plaintiff reported he was able to mow this lawn with decreased pain. Plaintiff reported no pain with sustained extension; however, the pain returned with extension to upright positioning. Plaintiff tolerated treatment well. Plaintiff was to continue to work on trunk strength and lumbar range of motion in order to decrease his pain with prolonged standing and walking.

On November 1, 2016, Plaintiff was seen by Dr. Donnie J. Holden for a follow-up.[1] (Tr. 485). Plaintiff reported he was doing great. Dr. Holden noted Plaintiff was in for short term disability. Dr. Holden noted Plaintiff had back trouble with bulging discs. Dr. Holden opined Plaintiff was "fighting a catch-22."

On November 1, 2016, Plaintiff was seen by Dr. William T. Dement for his back pain. (Tr. 594-595). Dr. Dement noted Plaintiff's depression screen was normal. Plaintiff reported he mowed his lawn the previous Saturday and noticed significant back pain after working as little as fifteen minutes. Plaintiff also noticed pain when standing and cooking for fifteen to twenty minutes. Dr. Dement noted Plaintiff had been participating in physical therapy for the past four weeks and that his back pain had decreased some. Plaintiff reported he continued to have pain in his lower back. Upon examination, Dr. Dement noted Plaintiff had no edema in his extremities. Plaintiff exhibited a normal gait and had 5/5 strength in his upper and lower extremities. Plaintiff exhibited pain in his left Achilles tendon and had mild pain to palpation in his mid-lumbar spine. Plaintiff was assessed with chronic midline low back pain without sciatica and morbid obesity. Plaintiff was counseled on the benefits of a low calorie, well-balanced diet with daily exercise. Due to his back pain, Dr. Dement recommended Plaintiff stay off of work for at least one more month.

On November 2, 2016, Plaintiff was seen by Mr. Pelzer for physical therapy for his low back pain. (Tr. 593). Plaintiff reported a mild increase in his ankle pain with the changing weather. Plaintiff reported his ankle pain was greater than his back pain. Mr. Pelzer noted Plaintiff demonstrated improved trunk strength and stability with exercises. Mr. Pelzer noted Plaintiff

---

[1] The Court notes progress notes from this medical provider are difficult to read.

reported the absence of low back pain with sustained extension. Plaintiff was encouraged to continue his exercises at home.

On November 7, 2016, upon the referral of Dr. Dement, Plaintiff was seen by Dr. Scott Cooper for his ankle/tendon pain. (Tr. 591-592). Plaintiff reported that his pain worsened as his workday progressed. After reviewing MRIs of Plaintiff's ankles, Dr. Cooper noted he did not see a whole lot. Upon examination, Dr. Cooper noted Plaintiff was a pleasant, healthy-appearing, though markedly overweight, early middle-aged man in no apparent distress. Plaintiff was noted to have markedly positive Silfverskiold tests bilaterally that was a little more pronounced on the left. Plaintiff had some tenderness, not really reproducible around his left Achilles insertion. Dr. Cooper assessed Plaintiff with left Achilles tendinitis and bilateral gastrocnemius contractures. Dr. Cooper noted that eighty to ninety percent of the time Achilles tendinitis did not require surgery. Dr. Cooper noted Plaintiff's physical job and his weight put stress on his ankles. Dr. Cooper suggested a weight loss program.  Dr. Cooper indicated that he showed Plaintiff stretching exercises and sent Plaintiff to a therapist.

On November 15, 2016, Plaintiff was seen by Jeanette I. Turley, a physical therapist, for lumbar and ankle pain. (Tr. 590-591). Plaintiff reported no low back pain but a two out of ten ankle pain. Plaintiff reported increased back pain after attending a gun show. Plaintiff tolerated treatment well. It was recommended that Plaintiff purchase new shoes with pronation control. Plaintiff was to continue with his home program.

On November 17, 2016, Plaintiff was seen by Kevin C. Baltz, a physical therapist, for back and ankle pain. (Tr. 588-589). Plaintiff reported his back pain was a two out of ten. Plaintiff requested that his ankle tightness be addressed. Plaintiff tolerated treatment well. Plaintiff was to continue with his home exercise program.

On November 21, 2016, Plaintiff was seen by Mr. Lee for physical therapy. (Tr. 587-588). Plaintiff reported his ankle pain was a one out of ten and his back pain was a two out of ten. Plaintiff tolerated therapy well. Plaintiff was to continue with strengthening exercises.

On November 23, 2016, Plaintiff was by Mr. Pelzer for physical therapy. (Tr. 586-587). Plaintiff reported having increased stability through the lumbar spine and increased flexibility through both ankles. However, Plaintiff reported his pain remained the same. Plaintiff reported he had attended a gun show in Tulsa and was able to walk for fifteen to thirty minutes but would then have to sit and rest five to ninety minutes. Plaintiff was to continue strengthening exercises.

On November 28, 2016, Plaintiff was seen by Amanda Johnson, NP, for low back pain. (Tr. 582-586). Plaintiff reported low back pain for the past two years that had worsened over time. Upon examination, Nurse Johnson noted Plaintiff was well nourished, well developed and in no acute distress. Plaintiff exhibited full range of motion of his neck with no tenderness to palpation. Nurse Johnson noted Plaintiff had a normal gait and station, and normal muscle tone in the upper and lower extremities with normal range of motion. Plaintiff exhibited pain with internal and external rotation of the hips. After reviewing Plaintiff's MRI it was recommended that Plaintiff undergo steroid injections. Plaintiff was counseled on lifestyle modification including weight loss and daily exercise.

On November 29, 2016, Plaintiff was seen by Katelyn M. Collins, a student therapist, for low back and ankle pain. (Tr. 581-582). Plaintiff reported his back pain was a seven out of ten with walking or standing more than twenty minutes. Plaintiff reported that pain management recommended a nerve ablation to address the back pain. Ms. Collins noted Plaintiff was able to perform strengthening exercises with an increase in difficulty and repetitions. Plaintiff reported increased back pain with standing exercises. Plaintiff was to continue to work on strengthening.

On December 1, 2016, Plaintiff was seen by Alaina M. Perry, a physical therapist, for back and ankle pain. (Tr. 578-579). Plaintiff report his ankle pain was a three out of ten while his back pain was a one out of ten. Plaintiff tolerated treatment well. Plaintiff was to continue to work on strengthening exercises.

On December 1, 2016, Plaintiff was seen by Dr. Dement for a follow-up visit. (Tr. 579-581). Plaintiff complained of lower back pain and bilateral Achilles tendonitis. Dr. Dement noted Plaintiff was participating in physical therapy for the left Achilles tendonitis and back pain. Plaintiff denied back pain when sitting but reported if he walked or stood for over fifteen minutes he would have to find a place to sit down. Plaintiff reported he attended a gun show in Tulsa a couple of weeks ago and had to sit for fifteen minutes after standing for 15 minutes. Plaintiff reported while at the gun show, with each successive sitting period the time to recover took longer. Dr. Dement noted Plaintiff would undergo medial branch blocks the next week. Dr. Dement opined if Plaintiff's Achilles problem resolved he would likely be able to return to work.

On December 5, 2016, Plaintiff was seen by Dr. Cooper for a follow-up for his bilateral gastrocnemius tightness and left Achilles tendinitis.  (Tr. 577). Dr. Cooper noted Plaintiff had been off of work for a couple of months due to his back pain. Dr. Cooper noted Plaintiff discussed his recent back treatment and how Plaintiff thought being off his feet had helped with the diffuse ankle pain. After examining Plaintiff., Dr Cooper recommended a boot for the left foot. Dr. Cooper reminded Plaintiff that this problem was usually treated non-surgically. Plaintiff was to return in four weeks.

On December 9, 2016, Plaintiff was seen by Dr. Adam Green for a bilateral medial branch nerve block. (Tr. 405-407). Plaintiff tolerated the procedure well and was asked to follow-up in the next few weeks.

8

On December 16, 2016, Plaintiff was seen by Dr. Green for a bilateral branch nerve block. (Tr. 423-425). Plaintiff tolerated the procedure well and was asked to follow-up in the next few weeks.

On December 30, 2016, Plaintiff was seen by Dr. Green for a follow-up appointment. (Tr. 434-445). Plaintiff reported at least eighty percent pain relief for at least four hours after the nerve blocks. Plaintiff denied weakness, dizziness, or chest pain. Upon examination, Dr. Green noted Plaintiff moved all extremities and was alert and oriented. Dr. Green recommended and Plaintiff agreed to undergo a radiofrequency ablation which occurred during the appointment.

On January 4, 2017, Plaintiff was seen by Dr. Cooper for a follow-up for bilateral gastrocnemius tightness, as well as left Achilles tendinitis. (Tr. 569). Plaintiff reported he was better. Dr. Cooper noted Plaintiff had suffered a setback when he smacked the back of his heel on a hard object. Dr. Cooper recommended Plaintiff return to therapy. Dr. Copper further noted while this issue did not normally require surgery, if Plaintiff continued to have trouble a recession would be a possibility.

On January 9, 2017, Plaintiff was seen by Mr. Pelzer for physical therapy for his left ankle. (Tr. 564-569). Mr. Pelzer noted Plaintiff had worn a boot for five weeks and now had decreased mobility. Plaintiff reported he was concerned about his return to work as there was no light duty but he thought he physician would return him to work. Plaintiff tolerated therapy well. Plaintiff was to continue to work on left ankle strengthening.

On January 13, 2017, Plaintiff underwent radiofrequency ablation to denervate the left L3/4, L4/5 and L5/S1 facet joints. (Tr. 452-454). Dr. Adams noted Plaintiff reported more than an

eighty percent decrease in his pain after the trial nerve blocks. Dr. Adams noted Plaintiff tolerated the procedure well.

On January 17, 2017, Plaintiff was seen by Samantha Claire Bolton, NP, due to experiencing an irregular heartbeat. (Tr. 558-559). Plaintiff denied shortness of breath or dizziness. Plaintiff denied headaches, speech problems, visual changes, or weakness. Upon examination, Nurse Bolton noted Plaintiff exhibited normal mood, behavior, speech, dress, motor activity, and thought processes. Plaintiff exhibited normal muscle tone and 5/5 strength. A Holter monitor was recommended.  Plaintiff was counseled on lifestyle changes to include weight loss, reducing sodium intake, and increasing physical activity.

On January 23, 2017, Plaintiff was seen by Mr. Pelzer for physical therapy. (Tr. 557). Plaintiff reported he had a cardiac appointment the previous week and that there was no evidence of "skipping beats." Plaintiff reported he would have to wear a monitor over the coming week to watch for any possible cardiac changes.  Mr. Pelzer noted Plaintiff demonstrated increased tolerance to ankle mobility with progression of exercises. Plaintiff was to continue to work on strengthening.

On January 30, 2017, Plaintiff was seen by Mr. Pelzer for physical therapy. (Tr. 555-556). Plaintiff reported increased back pain with prolonged standing. Plaintiff reported his pain was a two out of ten. Plaintiff reported decreased ankle pain overall with activities of daily living. Plaintiff was encouraged to continue with his home exercise plan.

On February 6, 2017, Dr. Philip Riley prescribed a 48-hour Holter Monitor after Plaintiff's reported heart palpitations which resulted in a benign report.  (Tr. 464-470).

On February 6, 2017, Plaintiff was seen by Mr. Pelzer for physical therapy. (Tr. 551-). Plaintiff reported prolonged standing and walking since getting out of the boot. Plaintiff also reported that his back continued to hurt at times but he could be more active than in the past. Plaintiff reported that his left ankle was sore. Plaintiff was to continue on strengthening exercises.

On February 10, 2017, Plaintiff was seen by Nurse Johnson for a pain management follow-up visit. (Tr. 547-551). Plaintiff reported some relief of his axial low back pain but he continued to have low back pain and pain in his buttocks. Plaintiff was noted to have a pleasant mood with an appropriate affect. Plaintiff was prescribed medication and counseled on lifestyle modification to include weight loss and daily exercise. Plaintiff was also to continue with his home exercise plan and to follow-up with psychiatry.

On February 14, 2017, Plaintiff was seen by Dr. Dement. (Tr. 545-546). Plaintiff complained of palpitations, hearing problems and back pain. Plaintiff reported he was still unable to work. Dr. Dement noted Plaintiff had a recent history of heart palpitations and that EKG and Holter Monitor testing were normal. Plaintiff also reported an intermittent tremor involving both hands that limited his ability to complete tasks requiring fine motor movements. Dr. Dement noted Plaintiff had undergone radiofrequency ablation, and that he no longer had pain in the center of his back. Plaintiff reported he continued to have pain along the flank regions bilaterally. Upon examination, Dr. Dement noted Plaintiff was morbidly obese. Plaintiff exhibited no significant pain in the lower mid back to palpation. Plaintiff had 5/5 strength to the upper and lower extremities. Dr. Dement assessed Plaintiff with tremors of the nervous system and a fine movement impairment and referred Plaintiff to neurology.

11

On February 27, 2017, Plaintiff was seen by Dr. Holden for a mental status examination follow-up appointment. (Tr. 484). Plaintiff reported quetiapine was not as effective. Plaintiff also reported tremors in his extremity. Dr. Holden made medication adjustments.

On May 23, 2017, Plaintiff was seen by Dr. David Brown, neurologist, for an initial consultation regarding his bipolar disorder. (Tr. 541-544). Plaintiff reported some loss of precision in his fingers while working on precision movements and occasional finger tingling. Plaintiff also reported a lack of feeling in his feet and toes that "comes and goes." Plaintiff also reported moving in his dreams. Upon examination, Dr. Brown noted Plaintiff exhibited normal speech and language. Plaintiff was found to have intact recent and remote memory. Plaintiff's fund of knowledge appeared appropriate and he an no concentration or attention impairments. Dr. Brown noted Plaintiff had a subtle weakness to thumb abductors, bilaterally. Plaintiff had a decreased second digit pinprick of the right hand, questionable on the left. Dr. Brown prescribed medication.

On June 1, 2017, Plaintiff was seen by Nurse Johnson for a pain management follow-up visit. (Tr. 537-541). Plaintiff reported since his last clinic visit he had been wondering about starting gabapentin for his bilateral leg pain. Plaintiff reported his pain was aggravated by standing, walking and exercise, and relieved by sitting and rest. Upon examination, Nurse Johnson noted Plaintiff had a normal gait but decreased lumbar range of motion. Plaintiff was found to have a pleasant mood with an appropriate affect. Nurse Johnson noted that gabapentin had made Plaintiff sleepy in the past and due the fact that he was taking Seroquel and klonopin she recommended not starting gabapentin. When epidural steroid injections were discussed, Plaintiff reported that steroids made him hallucinate. Nurse Johnson noted this limited the options available to treat Plaintiff's lumbar radicular pain. Nurse Johnson recommended referring Plaintiff to a neurosurgeon.

On June 14, 2017, Plaintiff underwent a MRI of the lumbar spine that revealed:

Degenerative disc disease lower lumbar spine at the L5-S1 level where there is a moderate-sized broad-based disc bulge and superimposed central disc herniation. This was present on the prior examination and has not significantly changed in size.

(Tr. 475-476)

On July 13 2017, Plaintiff was seen by Dr. Alisha Nicole Trent to establish case.  (Tr. 535-536). Plaintiff denied weight loss or jitteriness, vision problems, palpitations, shortness of breath or depression. Plaintiff reported low back pain. Upon examination, Dr. Trent noted Plaintiff was morbidly obese, but in no apparent distress. Plaintiff exhibited low back pain but had a normal gait. Plaintiff had a flat affect. Dr. Trent assessed Plaintiff with degenerative disc disease, morbid obesity, benign essential hypertension.  Dr. Trent indicated Plaintiff definitely needed to lose weight and extended Plaintiff's work leave until his surgical referral.

On July 18, 2017, Plaintiff was seen by Dr. Holden for follow-up appointment. (Tr. 483). Dr. Holden noted Plaintiff had a neurological consult with Dr. Brown.

On August 24, 2017, Plaintiff was seen by Melanie A. Martin, APRN, for a rash on his legs. (Tr. 534-535). Plaintiff denied any exposure to new products or exposure to poison ivy but indicated he had recently traveled to Missouri to watch the eclipse within a state park. After examining Plaintiff, Nurse Martin prescribed an ointment.

On August 25, 2017, Plaintiff was seen by Dr. Brown for a follow-up for his bipolar disorder. (Tr. 531-534). Dr. Brown noted Plaintiff was a pleasant forty-one year old male in no apparent distress. Plaintiff was well-developed and nourished with good attention to hygiene and body habitus. Dr. Brown noted Plaintiff's speech and language were within normal limits. Plaintiff's memory was noted as intact to recent and remote events. Dr. Brown noted Plaintiff had no difficulty or impairment of concentration or attention. Dr. Brown noted Plaintiff had subtle

weakness to thumb abductors bilaterally and a subtle postural tremor. Plaintiff was noted to have a narrow, steady gait. Plaintiff denied arm pain. Dr. Brown assessed Plaintiff with a mild essential tremor, suspected REM sleep behavior disorder, chronic C5/6 radiculopathies, and bipolar disorder. Dr. Brown recommended Plaintiff stop Seroquel given Plaintiff's risk for Parkinson's but noted Plaintiff's psychiatrist refused to discontinue this medication.

On September 6, 2017, Plaintiff was seen by Nurse Martin. (Tr. 530-531). Plaintiff complained of right foot and ankle swelling. Upon examination, Nurse Martin noted Plaintiff was well appearing and in no acute distress. Nurse Martin noted Plaintiff had generalized swelling of the right foot and ankle. An examination of Plaintiff's feet revealed good capillary refill with normal pulses. X-rays of Plaintiff's foot were negative. Plaintiff was instructed to keep his right leg elevation. Plaintiff was also counseled on lifestyle modifications to include weight loss and daily exercise. Dr. Hugh Donnell reviewed the case evaluation and agreed.

On September 20, 2017, Plaintiff was seen at the Virginia Mason Medical Center (VMMC) in Seattle, Washington, for a consultation for his back pain. (Tr. 521-525). Plaintiff reported his pain worsened with walking, bending, standing and extension, but improved with sitting and lying down. Upon examination, Dr. Herbie Yung noted Plaintiff was pleasant and had no aberrant behaviors. Plaintiff was noted to have a normal gait and posture. Plaintiff had intact range of motion and a negative straight leg test bilaterally. Dr. Yung noted that he reviewed Plaintiff's MRI of the lumbar spine dated June of 2017, and EMG studies performed in May of 2016. Dr. Yung discussed with Plaintiff that weight loss would be most important and would likely provide substantial relief of his back pain. Dr. Yung recommended Plaintiff continue with his home exercise program and recommended a recumbent bicycle or other spine neutral exercises and light resistance exercises. Dr. Yung noted Plaintiff reported that he had been out on FMLA since

14

September of 2016, but he thought he might be fired soon. Plaintiff reported he had inquired about temporary federal disability as he tried to lose weight.

On September 20, 2017, Plaintiff was also seen by Dr. Louis J. Nkrumah at VMMC. (Tr. 515-520). Plaintiff reported chronic low back pain for the past two years that had progressively worsened. Dr. Nkrumah noted Plaintiff had undergone physical therapy and radiofrequency ablation which provided some pain relief for a few months. Dr. Nkrumah noted Plaintiff reported that he was on disability from work because he had been unable to lift heavy loads from trailers. Upon examination, Dr. Nkrumah noted Plaintiff was a pleasant, morbidly obese young male in no acute distress. Plaintiff exhibited 5/5 motor strength in all muscle groups in both the upper and lower extremities, bilaterally. Plaintiff had intact sensation throughout. Plaintiff exhibited a normal gait. Dr. Nkrumah explained to Plaintiff that most of his low back pain might be due to his significant weight. Surgical intervention was not recommended. It was recommended that Plaintiff lose weight. Dr. Nkrumah opined it was appropriate for Plaintiff to go on temporary disability to focus on a weight loss program.

On September 25, 2017, Plaintiff was seen by Dr. Trent for a follow-up appointment. (Tr. 529-530). Plaintiff reported he had seen a neurosurgeon who told him he must lose weight before any back surgery would be considered. Plaintiff reported that he was going to be fired the next day but would be seeking long term disability. After examining Plaintiff, Dr. Trent assessed Plaintiff with morbid obesity and benign essential hypertension. Plaintiff was referred to weight management.

On November 3, 2017, Plaintiff was seen by Dr. Trent for a follow-up for his back issues and right breast pain. (Tr. 692-693). Plaintiff reported he was unable to afford the weight management program and requested other options. Dr. Trent noted Plaintiff had lost eleven

pounds. Plaintiff had a normal depression screen. Upon examination, Dr. Trent noted Plaintiff had 5/5 muscle strength in both upper and lower extremities. Plaintiff had some tenderness to the right breast. Dr. Trent noted Plaintiff had good insight, a euthymic mood, a normal affect, and intact memory. Dr. Trent thought the breast tenderness was muscular but recommended an ultrasound for reassurance.

On December 5, 2017, Plaintiff had a follow-up appointment with Dr. Brown. (Tr. 689-692). Plaintiff reported that Primidone was helpful for his tremor but made him excessively drowsy. Dr. Brown noted Plaintiff's sleep behavior disorder was under control. Plaintiff reported that he was still on Seroquel. Dr. Brown noted Plaintiff exhibited normal speech, language, memory, concentration, and attention. Dr. Brown changed Plaintiff's medication to propranolol and again recommended Plaintiff discontinue the Seroquel.

On January  3, 2018, Plaintiff was seen by Dr. Holden for a follow-up appointment. (Tr. 713). Plaintiff was noted as doing better.

On March 9, 2018, Plaintiff was seen by Dr. Trent for a rash and a medication refill. (Tr. 743-758). Upon examination, Dr. Trent noted Plaintiff was alert and oriented and in no apparent distress. Dr. Trent noted Plaintiff had 5/5 muscle strength in both upper and lower extremities, bilaterally. Plaintiff exhibited a normal gait. Dr. Trent noted Plaintiff had a fungal rash at the left nipple. Plaintiff was noted to have a flat affect. Dr. Trent assessed Plaintiff with benign essential hypertension, morbid obesity, pure hyperglyceridemia, neuropathy, and fungal rash of the torso. Plaintiff's medication were adjusted.  Plaintiff was to return in six months.

On April 17, 2018, Plaintiff was seen by Dr. Trent to discuss disability and to get a tetanus shot. (Tr. 759-773). Plaintiff reported that his back pain was worse and that he had been let go

from work. Plaintiff reported that long term disability told him he could work as a door greeter or a cashier. Dr. Trent noted Plaintiff stuck himself in the abdomen with a nail from a fence. Plaintiff reported back pain but denied weakness, dizziness, or depression. Upon examination. Dr. Trent noted Plaintiff had a normal gait, normal affect, and intact memory. Dr. Trent noted despite participating in a weight loss program, Plaintiff had gained ten pounds since his last visit. Plaintiff acknowledged that he could be more proactive with writing down his food choices. Dr. Trent recommended pool/aqua aerobics. Dr. Trent noted Plaintiff seemed complacent with being on disability and at home. Dr. Trent discussed possible jobs to keep Plaintiff in the work force such as a greeter using a stool or chair.  Dr. Trent opined that core strengthening and weight loss were paramount to treating Plaintiff's back pain.

On May 31, 2018, Plaintiff was seen by Nurse Martin complaining of left ankle swelling. (Tr. 774-786, 826). Plaintiff reported he had accidentally twisted his ankle the previous day. Plaintiff reported slight pain when weight bearing. Upon examination, Nurse Martin noted slight tenderness with swelling to the left lateral malleolus.  Plaintiff exhibited a normal gait. A left ankle x-ray was negative for fracture of dislocation. Plaintiff was instructed to elevate his ankle when able.

On July 2, 2018, Plaintiff was seen by Dr. Holden for a follow-up appointment. (Tr. 723). Dr. Holden noted Plaintiff was not approved for disability so his parents were helping with expenses. Plaintiff reported some sleep disturbance. Dr. Holden adjusted Plaintiff's medication.

On August 13, 2018, Plaintiff was seen by Nurse Martin complaining of an insect bite to his left toe. (Tr. 787-801).

On August 31, 2018, Plaintiff was seen by Dr. Trent for a medication refill appointment. (Tr. 802-816). Plaintiff reported his psychiatrist started him on phentermine. Plaintiff indicated that he was doing a mini stepper at home for exercise. Plaintiff reported was looking for a job that allowed him to sit. Treatment notes indicated Plaintiff denied medication side effects. Upon examination, Dr. Trent noted Plaintiff's affect and thought content were normal. With respect to Plaintiff's extremities, Dr. Trent noted no pedal edema or cyanosis and that perfusion appeared adequate. Dr. Trent assessed Plaintiff with pure hyperglyceridemia, benign essential hypertension, morbid obesity, and hypertriglyceridemia. Dr. Trent recommended that Plaintiff follow a diet more regularly. Plaintiff was prescribed medication. Plaintiff was to follow-up in six months.

On October 31, 2018, Plaintiff was seen by Dr. Shawn Brummett to establish care. (Tr. 838-854). Dr. Brummett noted Plaintiff requested that a medical source statement be completed if possible. Dr. Brummett noted Plaintiff had a history of back pain. Plaintiff reported his pain worsened with activity, as well as prolonged sitting. Plaintiff reported he was seeking disability. Plaintiff reported he had gone to pain management clinic but had not been in over a year and could not recall the provider. Plaintiff also complained of bilateral, cracked and bleeding callouses on his feet that were growing and hard to manage. Dr. Brummett noted Plaintiff had a psychiatrist that managed Plaintiff's bipolar disorder. Treatment notes indicated Plaintiff's hypertension and tremors were controlled with medication. Upon examination, Dr. Brummett noted Plaintiff was obese and in no distress. Plaintiff exhibited a normal gait and station. Dr. Brummett noted trace bilateral lower extremity edema. Plaintiff had thick callouses on the heel, ball, and great toe, bilaterally. Plaintiff was found to have normal mood, affect, and thought content. Dr. Brummett assessed Plaintiff with callus of foot, fissure in skin of foot and degenerative disc disease of the

lumbar spine. Plaintiff was referred to podiatry and encouraged to see his pain management specialist. Dr. Brummett told Plaintiff that he did not completed disability exams.

On December 5, 2018, Plaintiff had an appointment with Dr. Brummett to discuss disability. (Tr. 855-869). Plaintiff indicated that he needed a letter from his primary care physician stating that he had herniated discs in his neck and back for disability approval. Plaintiff denied any changes to his back pain. Plaintiff could not recall the name of his pain management doctor. Upon examination, Dr. Brummett noted Plaintiff was healthy appearing and in no distress. Plaintiff exhibited a normal gait and station. Plaintiff had a normal mood, affect, and thought content. Dr. Brummett informed Plaintiff that he did not perform disability evaluations. Dr. Brummett provided Plaintiff with a temporary handicap parking permit due to Plaintiff's pain being exacerbated by walking long distances.

On December 17, 2018, Plaintiff was seen by Dr. Brummett for a follow-up for his back pain. (Tr. 870-886). Plaintiff reported constant neck pain that occasionally radiated to his shoulder, bilaterally. Plaintiff reported he had occasional numbness in the fingers of his left hand, and rarely had numbness in the fingers of his right hand. Plaintiff reported daily lumbar back pain that occasionally radiated down both of his legs. Plaintiff indicated walking, prolong standing and sitting for long periods made his pain worse. Dr. Brummett noted Plaintiff had been treated by pain management, and that Plaintiff reported gabapentin and Lyrica made him drowsy and that steroids caused hallucinations. Plaintiff reported he was seen by a neurosurgeon and that surgery was not an option due to his weight. Plaintiff indicated he had been using a stationary bike for the past two weeks. Plaintiff reported severe pain after fifteen to twenty minutes of activity. Upon examination, Dr. Brummett noted Plaintiff was healthy appearing and in no distress. Plaintiff had 1+ edema in his lower extremities, bilaterally. Plaintiff exhibited a normal gait and station. Plaintiff

was found to have a normal mood, affect, and thought content. Plaintiff was to continue to try to lose weight and to use Tylenol and Ibuprofen for pain as needed.

On January 29, 2019, Plaintiff was seen by Dr. Brummett for a skin problem. (Tr. 887-902). Plaintiff reported he had a skin tag on his back that he wanted checked. Upon examination, Dr. Brummett noted Plaintiff was healthy appearing and in no distress. Plaintiff exhibited a normal gait and station. No irregularities were noted regarding the skin tag. Plaintiff was found to have a normal mood, affect, and thought content. Dr. Brummett offered to remove the skin tag but Plaintiff declined.

On February 18, 2019, Plaintiff was seen by Dr. Brummett for a medication refill appointment. (Tr. 903-919). Plaintiff complained of increased cervical spine pain, with some numbness and tingling in the left hand. Dr. Brummett noted Plaintiff saw a spine surgeon in Seattle years ago who recommended Plaintiff delay surgery. Plaintiff reported he had been unable to lose weight and his symptoms had worsened. Plaintiff reported some relief with different stretches and exercises that he learned in physical therapy. Dr. Brummett noted Plaintiff's blood pressure had been stable with medication. Upon examination, Dr. Brummett noted Plaintiff was healthy appearing and in no distress. Plaintiff had 1+ edema in his lower extremities, bilaterally. Plaintiff exhibited a normal gait and station. Plaintiff was found to have a normal mood, affect, and thought content. Dr. Brummett referred Plaintiff to Ortho Spine.

On March 15, 2019, Plaintiff underwent a MRI of the lumbar spine that revealed progression of bilateral foraminal stenosis at L5-S1, now moderate; otherwise, stable findings as compared to June 14, 2017, without evidence of spinal stenosis. (Tr. 830-835).

On March 27, 2019, Plaintiff was seen by Dr. Brummett for a rash on his left leg. (Tr. 920-934). Plaintiff denied pain, swelling or drainage. Dr. Brummett suspected contact dermatitis and prescribed a cream.

On May 9, 2019, Plaintiff underwent a general physical examination performed by Kelsey Camp, APRN.  (Tr. 944-950). Plaintiff complained of herniated discs in the lower back, neck and shoulder pain, and bipolar disorder. Upon examination, Nurse Camp noted Plaintiff had normal range of motion of his spine and extremities. Nurse Camp noted no muscle spasm, muscle weakness or muscle atrophy. Plaintiff exhibited a normal gait and station. A limb function test revealed Plaintiff could hold a pen and write, touch fingertips to palm, oppose thumb to fingers, pick up a coin, stand/walk without an assistive device, and squat/arise from a squatting position. Plaintiff was unable to walk on heel and toes.  Plaintiff was found to have a one hundred percent grip strength, bilaterally. Nurse Camp noted Plaintiff was oriented to time, person, and place, and that there was no evidence of psychosis. Nurse Camp opined Plaintiff had mild walking/standing/carrying limitations.

## III.    Applicable Law:

The Court reviews "the ALJ's decision to deny disability insurance benefits de novo on the record to ensure that there was no legal error and that the findings of fact are supported by substantial evidence on the record as a whole." Combs v. Berryhill, 878 F.3d 642, 645-46 (8th Cir. 2017).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support a conclusion." Id.  The Court considers "the record as a whole, reviewing both the evidence that supports the ALJ's decision and the evidence that detracts from it." Id.  The Court will not reverse an administrative decision simply because some evidence may support the opposite conclusion. Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011). If, after

reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. Id.

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001); see also 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. See 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982), abrogated on other grounds by Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §§ 404.1520, 416.920.

IV.    **Discussion:**

Plaintiff argues the following issue on appeal: 1) the ALJ erred in determining Plaintiff's RFC; 2) the ALJ erred in relying on the medical opinions of non-examining doctors who did not have the access to the complete medical record; and 3) the Appeals Council erred by failing to remand the case back to the ALJ to consider the medical opinion of Plaintiff's treating physicians.

A.    **Evidence Submitted to the Appeals Council:**

The regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision. See 20 C.F.R. § 404.970(b). The newly submitted evidence thus becomes part of the "administrative record," even though the evidence was not originally included in the ALJ's record. See Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir.1992). If the Appeals Council finds that the ALJ's actions, findings, or conclusions are contrary to the weight of the evidence, including the new evidence, it will review the case. See 20 C.F.R. § 404.970(b).  Here, the Appeals Council denied review, finding that the new evidence did not show a reasonable probability that it would change the outcome of the decision. In these circumstances, the Court does not evaluate the Appeals Council's decision to deny review, but rather the Court determines whether the record as a whole, including the new evidence, supports the ALJ's determination. See Kitts v. Apfel, 204 F.3d 785, 786 (8th Cir.2000) (per curiam) ("When the Appeals Council has considered new and material evidence and declined review, we must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence."). Based on the above, the Court will now address the ALJ's decision in this case.

B.    **Subjective Complaints and Symptom Evaluation:**

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to:  (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id.  As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors.  A review of the record revealed that during the time period in question, Plaintiff indicated he was able to take care of his personal needs slowly, to prepare simple meals, to drive, to shop in stores and by computer, to read, to paint miniatures and to play video games. (Tr. 283-290). Plaintiff also reported he was able to go out to eat and visit friends weekly and to play table- top board games. It is noted that on October 31, 2016, Plaintiff reported to his physical therapist that he was able to mow the lawn with decreased pain. (Tr. 596). However, the very next day Plaintiff told Dr. Dement that he had significant back pain while mowing. (Tr. 594). While Plaintiff testified that he was unable to sit for prolonged period of times, in a Pain Report dated November 14, 2017, Plaintiff indicated he was able to sit for three to four hours before pain occurred. (Tr. 280-281). In August of 2018, Plaintiff reported to Dr. Trent that he was looking for a job where he could sit. (Tr. 808).

With respect to Plaintiff's alleged physical and mental impairments, the record revealed that Plaintiff was treated conservatively and appeared to experience some relief with the use of medication.  See Black v. Apfel, 143 F.3d 383, 386 (8th Cir.1998); See Robinson v. Sullivan, 956 F.2d 836, 840 (8th Cir. 1992) (course of conservative treatment contradicted claims of disabling pain).  While Plaintiff may indeed have an injury in his back and experience some degree of pain, the medical evidence indicates that his condition is not of a disabling nature.  See Lawrence v. Chater, 107 F.3d 674, 676 (8th Cir. 1997) (upholding ALJ's determination that claimant was not disabled even though she had in fact sustained a back injury and suffered some degree of pain); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). As for Plaintiff's alleged disabling mental impairments, the record consistently showed Plaintiff to have a normal mood, normal memory, normal thought processes, and normal attention and concentration.

Therefore, although it is clear that Plaintiff suffers with some degree of limitation, he has not established that he is unable to engage in any gainful activity.  Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

**C.    The ALJ's RFC Determination and Medical Opinions:**

Plaintiff argues the ALJ erred by relying on medical opinions by non-examining medical consultants who did not have access to the complete medical record, and that the ALJ then drew his own inferences from a March of 2019 MRI report.

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record. Id.  This includes medical

25

records, observations of treating physicians and others, and the claimant's own descriptions of his limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Cox. V. Astrue, 495 F.3d 614, 619 (8th Cir. 2007). However, there is no requirement that an RFC finding be supported by a specific medical opinion. See Myers v. Colvin, 721 F.3d 521, 526-27 (8th Cir. 2013) (affirming RFC without medical opinion evidence).

In the present case, the ALJ considered the medical assessments of non-examining  and examining agency medical consultants, Plaintiff's subjective complaints, and his medical records when he determined Plaintiff could perform sedentary work with limitations.  The Court notes that in determining Plaintiff's RFC, the ALJ discussed the medical opinions, and set forth the reasons for the weight given to the opinions.  Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians")(citations omitted); Prosch v. Apfel, 201 F.3d 1010 at 1012 (the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole). The ALJ also took Plaintiff's obesity into account when determining Plaintiff's RFC. Heino v. Astrue, 578 F.3d 873, 881-882 (8th Cir. 2009) (when an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal).

The ALJ was required to adopt an RFC based upon the record as a whole, and the Court finds that the ALJ met this obligation. See Boyd v. Colvin, 831 F.3d 1015, 1020 (8th Cir. 2016) (stating that "it is the responsibility of the ALJ, not a physician, to determine a claimant's RFC;" and that the ALJ does so on the basis of "all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations" (quotation omitted). After reviewing the entire transcript, the Court finds substantial evidence supporting the ALJ's RFC determination for the time period in question.

Furthermore, after reviewing the record, the Court finds the Appeals Council did not err in declining to consider the opinions of Plaintiff's treating psychiatrist and primary care physician. Byrd v. Saul, - - Fed.Appx - -, 2021 WL 1400913, at *1 (8th Cir. 2021)(citations omitted).

### D.    Hypothetical Question to the Vocational Expert:

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005).   Accordingly, the Court finds that the vocational expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude him from performing work as a telephone information clerk, an addressing clerk, and a ticket counter. Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996)(testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

### V.    Conclusion:

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice. **The parties have fourteen days from receipt of our**

report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 16th day of April 2021.


/s/  *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE